**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM L. KELLEY,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Case No. 2:23-cv-1391**<br>**Judge James L. Graham**<br>**Magistrate Judge S. Courter M. Shimeall** |
| **ANNETTE CHAMBERS-SMITH, *et al.*,** | : | |
| **Defendants.** | : | |

**REPORT AND RECOMMENDATION**

Plaintiff, an Ohio inmate proceeding without the assistance of counsel, brings this action under 42 U.S.C. § 1983 against several officials of the Ohio Department of Rehabilitation and Correction ("ODRC") for violation of his constitutional rights while incarcerated. The Court previously dismissed all other defendants and all of Plaintiff's claims except his First Amendment retaliation claim and Fourteenth Amendment equal protection claim against Defendants Michael Laytart and Joe Schifer, both of whom are officials at the Marion Correctional Institution ("MCI"). (ECF No. 61.) The remaining Defendants now move for summary judgment on these claims. (ECF No. 76.) Also pending before the Court is Defendants' Motion to Strike and/or Disregard Plaintiff's Response. (ECF No. 84.) For the following reasons, it is **RECOMMENDED** that Defendants' Motions (ECF Nos. 76, 84) be **DENIED**.

## I. BACKGROUND

Plaintiff is an African-American veteran who was housed in MCI's veterans' dorm in December 2021. During the relevant time period, Defendant Schifer was a Sergeant at MCI

responsible for supervising MCI's veterans' dorm and Defendant Laytart was a Case Manager for inmates housed there.

According to Plaintiff's Second Declaration: Between December 17 and 20, 2021, Plaintiff and inmates Brown and Johnson made numerous verbal complaints to other inmates and MCI staff about an unwritten, racially discriminatory policy enforced by veterans' dorm staff. (ECF No. 82-1, PAGEID ##: 649.) On the morning of December 20, 2021, Defendant Laytart, "angry" over these complaints, came directly to Plaintiff's bunk at the end of D-row, ordered Plaintiff to pack his belongings and move them to the dorm's dayroom, and then instructed inmates Brown and Johnson to prepare to be moved. (*Id.* at PAGEID #: 649.) Defendant Schifer then repeated the same directives to Plaintiff and Brown and Johnson. (*Id.* at PAGEID #: 650.) Former MCI inmate Douglas F. Roberts, who was also a resident of the veterans' dorm in December 2021, saw Defendants Laytart and Schifer tell Plaintiff and inmates Brown and Johnson to pack up their things. (*Id.* at PAGEID #: 646.) Plaintiff and Mr. Roberts both aver that Plaintiff's bunk was then turned sideways, never removed, and re-occupied by a Caucasian, non-veteran inmate who often spent time in Defendants Laytart's and Schifer's offices. (*Id.* at PAGEID #: 646, 650.) Plaintiff further states that he and inmates Brown and Johnson were reassigned to more congested locations in the dorm with "High 90 Temperatures." (*Id.* at PAGEID #: 650.)

In the months that followed, Plaintiff and Mr. Roberts aver that Plaintiff got into a physical altercation and numerous verbal confrontations with a group of 6–8 inmates who routinely "hung out" in Defendants Laytart's and Schifer's offices over the previous complaints Plaintiff filed against Defendants and "racial slurs" directed at Plaintiff. (*Id.* at PAGEID #: 647, 650.) This group of inmates also often disrupted Plaintiff's paralegal studies by entering the designated study area to engage in "horse play" and direct racial slurs at him. (*Id.* at PAGEID ##: 647, 651–52.)

The Declarations of Defendants Laytart and Schifer (ECF Nos. 76-1, 76-2), attached to Defendant's Motion for Summary Judgment, present a materially different narrative. Defendant Schifer attests that, in December 2021, Central Office directed MCI to reduce bunks institution-wide to increase spacing due to the COVID-19 pandemic, and that, under the Deputy Warden of Operations' directions, the veterans' dorm was to lose six bunks, requiring twelve residents to move. (ECF No. 76-1, PAGEID ##: 597–98.) He states that MCI's Deputy Warden chose which bunks would be removed based on dorm configuration, and that Unit Manager Edoja assisted the displaced inmates to move into other open beds within the same veterans' dorm. (ECF No. 76-1, PAGEID #: 597–98.) Defendant Schifer avers that no inmate whose bunk was eliminated was transferred to a different unit and that Plaintiff was moved on December 20, 2021, from bed 47 to bed 30 within the veterans' dorm. (*Id.* at PAGEID ##: 598–99.) He further states that Plaintiff's bunk was one of the six removed and was not re-occupied, and that Black, white, and Hispanic inmates were all required to move beds as part of the downsizing. (*Id.*)

Defendant Laytart likewise declares that Central Office directed MCI to reconfigure the beds in the veterans' dorm to create more space due to the COVID-19 pandemic, that the six bunks in "D-Row," including Plaintiff's, were removed, and that Unit Manager Edoja coordinated the bed reassignment. (ECF No. 76-2, PAGEID #: 605.) Both Defendants Schifer and Laytart deny that they had authority to determine which bunks to eliminate or which inmates to move. (ECF No. 76-1, PAGEID ##: 598–99; ECF No. 76-2, PAGEID ##: 605–06.) They further deny that the decisions regarding which bunks to eliminate, or which inmates were affected, were motivated by race or an inmate's complaints. (*Id.*)

## II. DEFENDANTS' MOTION TO STRIKE AND/OR DISREGARD PLAINTIFF'S RESPONSE (ECF NO. 84)

As an initial matter, Defendants request that the Court strike and/or disregard Plaintiff's Response to Defendants' Motion for Summary Judgment (ECF No. 82), arguing that the Response was filed untimely and that it constitutes an unauthorized sur-reply because Plaintiff's First Declaration (ECF No. 81) was entered on the docket before his Response. (ECF No. 84.)

First, as to the timeliness of Plaintiff's Response, Defendants argue that the Court should regard Plaintiff's Response as untimely because it was entered on the docket on January 20, 2026, twelve days after Plaintiff's deadline to respond to Defendants' Motion for Summary Judgment. (ECF No. 84.) Plaintiff counters that his Response should be considered filed on January 8, 2026, under the prison mailbox rule, because Belmont Correctional Institution ("BCI") applied postage to his Response on that date. (ECF No. 86.)

The prison mailbox rule considers a pro se prisoner's document to be filed at the time he "delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988). Defendants argue that Plaintiff's Response is ineligible for the prison mailbox rule because the envelope in which Plaintiff mailed the Response is undated.

Plaintiff contends that he deposited both his Response and an exhibit to his Response, presumably his First Declaration, in BCI's mail system on January 7, 2026. (ECF No. 85, PAGEID ##: 675–76.) Plaintiff further provided an Inmate Demand Statement that reflects that BCI charged him $3.28 in postage for a mailing to the Court on January 8, 2026. (ECF No. 86-1, PAGEID #: 689.) The postage stamp affixed to the envelope in which Plaintiff mailed his Response reflects that it cost $3.28. (ECF No. 82-2, PAGEID #: 665.) Accordingly, the Undersigned finds that the prison mailbox rule applies to Plaintiff's Response such that it is

considered timely filed on January 8, 2026, the deadline for Plaintiff to respond to Defendants' motion for summary judgment.

Next, Defendants contend that Plaintiff's Response is an unauthorized sur-reply because Plaintiff's First Declaration was entered on the docket before Plaintiff's Response. (ECF No. 84.) Defendants appear to contend that the Court should construe Plaintiff's First Declaration as Plaintiff's initial response to Defendants' Motion for Summary Judgment, and Plaintiff's Response as an unauthorized second response. But nothing in Plaintiff's First Declaration suggests that Plaintiff intended his First Declaration to serve as a standalone response to Defendants' summary judgment motion. To the contrary, Plaintiff's First Declaration states that "the Declaration . . . was placed in [BCI's] mail system on January 7th, 2026 along with his response to Defendants['] Motion for Summary Judgment." (ECF No. 81, PAGEID #: 623.) Moreover, Defendants' decision to construe Plaintiff's First Declaration as Plaintiff's response in opposition to their summary judgment motion does not control the Court's construction. Thus, the Undersigned concludes that Plaintiff's Response opposing Defendants' Motion for Summary Judgment was not an unauthorized sur-reply.

Finally, even if Plaintiff's Response was considered to be an unauthorized second response to Defendants' motion for summary judgment, the Court, in its discretion, declines to strike or disregard Plaintiff's Response, particularly since Defendants allege no prejudice from its consideration.[1] *See, e.g.*, *Younker v. Ohio State Univ. Med. Ctr.*, No. 2:11-cv-00749, 2013 WL 3222902, at *2 (S.D. Ohio June 25, 2013) (declining to strike sur-reply for noncompliance with local rules where the sur-reply did not cause prejudice).

[1] The Court further notes that Defendants, without explanation or first seeking leave of Court, filed a second Reply in support of their Motion for Summary Judgment. (*See* ECF Nos. 83, 87.) Defendants' second Reply is substantively identical to Defendants' first Reply. (*Compare* ECF No. 83 with ECF No. 87.)

Accordingly, it is **RECOMMENDED** that Defendants' Motion to Strike and/or Disregard Plaintiff's Response (ECF No. 84) be **DENIED**.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 76)

Defendants move for summary judgment on Plaintiff's two remaining claims against Defendants Laytart and Schifer. (ECF No. 76.) Plaintiff opposes. (ECF Nos. 81, 82.)

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the court may "consider the fact undisputed for purposes of the motion").

The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the

record"). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

**B. Analysis**

Plaintiff brings two remaining claims against Defendants Laytart and Schifer for (1) retaliation in violation of the First Amendment, and (2) violation of his Fourteenth Amendment right to equal protection. The Undersigned addresses each claim in turn.

**1. First Amendment Retaliation**

A First Amendment retaliation claim involves three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff avers that he made verbal complaints to MCI staff regarding discriminatory policies enforced by the veterans' dorm staff. (ECF No. 82-1, PAGEID #: 649.) Filing grievances against prison officials on one's own behalf is "undisputed[ly]" protected by the First Amendment. *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)). This is true even "though [Plaintiff] pursued his grievance orally, rather than in writing." *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018).

The issue, then, is whether Defendants Laytart and Schifer took an adverse action against Plaintiff, and if so whether the action was motivated, at least in part, by Plaintiff's protected conduct.

As to the adverse action prong, the Sixth Circuit has explained that:

> "[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake"—here, the filing of grievances or lawsuits against prison officials. *Id.* at 396 (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir. 1982)). Whether an act is sufficiently adverse varies based on context. The context here is a prison; and prisoners "may be required to tolerate more than average citizens[ ] before an action taken against them is considered adverse." *Id.* at 398. Even so, however, an act need not be egregious to be adverse. *Id.*

*LaFountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013).

Relevant here, "[i]n the prison context, an action comparable to transfer to administrative segregation would certainly be adverse," *Thaddeus-X*, 175 F.3d at 396, and actions that result in "more restrictions and fewer privileges for prisoners" are also considered adverse. *Hill*, 630 F.3d at 474. "[I]n most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

Plaintiff avers that Defendants reassigned him to a hotter, more congested location in the veterans' dorm where temperatures often rose to the "High 90 Temperatures." (ECF No. 82-1, PAGEID #: 650.) The Sixth Circuit has found that "transferring [a prisoner] to a less desirable housing area" constitutes an "adverse action[]." *Brown v. Gray*, No. 21-3386, 2022 WL 961246, at *5 (6th Cir. Mar. 28, 2022) (citing *Hill*, 630 F.3d at 474; *Thaddeus-X*, 175 F.3d at 394).

Defendants concede that Plaintiff's bed move occurred. (ECF No. 76, PAGEID #: 590.) They argue, however, that Plaintiff was "never move[d] from a bunk in the veterans' dorm to one in a different dorm where he would be subjected to physical and verbal mistreatment because of his race." (*Id.*) While it may be true that Plaintiff never transferred dorms, it is undisputed that Plaintiff's bed move occurred, and Defendants offer no evidence rebutting Plaintiff's statements regarding the hotter, more congested conditions of Plaintiff's new bed assignment, or otherwise

substantively argue that Plaintiff's bed move to a worse location in the veterans' dorm is not an adverse action. Thus, viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude as a matter of law that Plaintiff's bed move to a hotter, more congested location was not an adverse action. *See Banks v. Michigan Dep't of Corr.*, No. 15-1082, at 2 (6th Cir. Oct. 30, 2015) (finding that the district court's determination that a bed reassignment did not constitute an adverse action was "premature" where the plaintiff experienced health issues as a result of the reassignment). Accordingly, Plaintiff has overcome his summary judgment burden on this element.

The third and final element of a First Amendment retaliation claim requires Plaintiff to prove that "the adverse action was motivated at least in part by [his] protected conduct," *i.e.*, that the defendants' "subjective motivation for taking the adverse action was at least in part to retaliate against the prisoner for engaging in protected conduct." *Hill*, 630 F.3d at 475. However, "retaliation 'rarely can be supported with direct evidence of intent.'" *Harbin–Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (citation omitted). That is why "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate" to consider when determining whether a genuine issue of fact on the third prong has been established. *Thaddeus–X*, 175 F.3d at 399. That said, "temporal proximity alone is rarely, if ever, sufficient to establish causation." *Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019).

"Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant" to show that he or she "would have taken the same action in the absence of the protected activity." *Thaddeus-X*, 175 F.3d at 399. If a defendant meets his or her burden of production in this regard, he or she "is entitled to prevail on summary judgment." *Id.*

Plaintiff avers that, shortly after he made verbal complaints about the veterans' dorm staff, Defendant Laytart entered the veterans' dorm "angry" over these complaints and ordered him to pack up his belongings, and that Defendant Schifer then repeated these directives. (ECF No. 82-1, PAGEID #: 649–650.) Plaintiff further testifies that he and the other two inmates who had made complaints were relocated to less desirable bed assignments while other residents of the veterans' dorm reoccupied their beds. Mr. Roberts corroborated Plaintiff's account of Defendants Laytart and Schifer issuing these directives. (ECF No. 82-1, PAGEID #: 646.) Thus, in addition to the brief period time between Plaintiff's protected conduct and the adverse action, Plaintiff offers testimony that Defendant Laytart was angry about Plaintiff's complaints when issuing the bed move directives, that Defendant Schifer repeated those directives, and that Plaintiff and the other inmates who complained were singled out to be moved to less desirable bed locations.

The Court is required at this stage to draw all reasonable inferences in the light most favorable to Plaintiff. Doing so here leads to the inference, at this stage, that Defendants Laytart and Schifer were angry—and took adverse action against Plaintiff—because of Plaintiff's grievances. *See* *Rayos v. Leavitt*, No. 1:20-CV-968, 2022 WL 876934, at *4 (W.D. Mich. Feb. 22, 2022), *report and recommendation adopted*, No. 1:20-CV-968, 2022 WL 873633 (W.D. Mich. Mar. 24, 2022) (genuine issue of material fact as to the issue of a causal connection where there was a brief period of time between plaintiff's protected conduct and the adverse action and plaintiff offered testimony that prison official was "angry" about the protected conduct).

Notably, Defendants do not contradict Plaintiff's account of Defendants Laytart and Schifer's directing him to pack up his belongings. They argue instead that Plaintiff cannot establish causation because Defendants Laytart and Schifer "had no power to affect Plaintiff's bed move" because "the specific bunks that were to be eliminated, and the open bed to which Plaintiff

was to be reassigned, were [decisions] made by Central Office, MCI's Deputy Warden of Operations, and the dorm's Unit Manager respectively." (ECF No. 76, PAGEID #: 594.) In support of this contention, Defendants offer their Declarations, wherein they aver that they did not have authority to decide Plaintiff's bed move and that, in any event, Plaintiff's bed move occurred in response to a "mandate" from Central Office to create more space between beds in response to the COVID-19 pandemic. (ECF Nos. 76-1, 76-2.) Aside from their own Declarations, Defendants offer no documentary evidence of any such mandate or of any independent decisionmaker directing Plaintiff's bed move. This is a problem for Defendants because "[w]here a plaintiff sets forth 'specific, nonconclusory allegations' of retaliation 'that could support a jury verdict at trial,' the defendant cannot carry his or her burden at summary judgment by offering mere 'summary denials.'" *Reynolds-Bey v. Harris*, 428 F. App'x 493, 505 (6th Cir. 2011) (citing *Thaddeus–X*, 175 F.3d at 399). A self-serving affidavit stating that Defendants would have taken the same action regardless of Plaintiff's complaints "consists of precisely the type of summary denial at issue in *Thaddeus-X*." *See id.*

On this record, the close temporal proximity between Plaintiff's complaints and his bed move, the reasonable inference that the move was taken in response to his protected conduct, and the tension between the parties' competing declarations together create a genuine issue of material fact regarding Defendants Laytart's and Schifer's involvement in the decision to move Plaintiff's bed and the underlying motivation for that move. Stated another way, Plaintiff, and others, give an account that supports his claim and meets the elements; Defendants refute that account. It cannot be said as a matter of law that Plaintiff has failed to establish causation. This is just the kind of situation that presents a genuine dispute of material fact. Summary judgment in Defendants' favor is therefore inappropriate.

Accordingly, it is recommended that Defendants' Motion for Summary Judgment be **DENIED** as to Plaintiff's First Amendment retaliation claim.

**2. Fourteenth Amendment Equal Protection**

In his Fourteenth Amendment equal protection claim, Plaintiff argues that Defendants Laytart and Schifer violated his equal protection rights because they treated him differently based on his race. "To successfully raise an equal protection claim, a party must show that [he] received disparate treatment compared to similarly situated individuals." *Prado v. Thomas*, 804 F. App'x 332, 340 (6th Cir. 2020) (citing *Ctr. for Bio-ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)). "A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011).

Direct evidence of discrimination "is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Id.* at 458 (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002)). Plaintiff offers no evidence of any such remarks or conduct of that nature by Defendants Laytart and Schifer.

To prove his equal protection claim through indirect evidence under the *McDonnell Douglas* burden-shifting framework, Plaintiff must demonstrate that: "(1) he was a member of a protected class; (2) he was qualified for favorable treatment; (3) he was subjected to an adverse decision; and (4) he was treated differently than similarly situated non-protected individuals." *McKinney v. Smith*, No. 1:18-CV-603, 2018 WL 3197434, at *6 (W.D. Mich. June 29, 2018) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (internal quotations omitted)). To be similarly situated, "the comparative [prisoner] 'must have dealt with the same

[decision maker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [the defendant's] treatment of them for it.'" *Umani*, 432 F. App'x at 460 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 586 (6th Cir. 1992). Once the plaintiff sets forth a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. *Arendale*, 519 F.3d at 603. If the defendant satisfies this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination. *Id.* The ultimate burden of persuasion remains at all times with the plaintiff. *Id.*

Plaintiff and Mr. Roberts aver that Plaintiff and two other African-American inmates, inmates Brown and Johnson, were moved from their existing bunks to hotter, more congested areas of the veterans' dorm, and that their vacated bunks were re-occupied by white inmates. (ECF No. 82-1, PAGEID #: 650.) Viewing the record in the light most favorable to Plaintiff, the white inmates who, according to Plaintiff and Roberts, reoccupied the vacated bunks were housed in the same dorm and were subject to the same bed-assignment decisions by the same staff, which is sufficient at this stage to raise a triable issue as to whether they were similarly situated.

Defendants dispute these facts, arguing that Plaintiff's bed was eliminated and never reoccupied. (ECF No. 76, PAGEID #: 590; ECF Nos. 76-1, 76-2.) Defendant Schifer avers that approximately the same number of white, Black, and Hispanic inmates residing in the veterans' dorms were moved to different beds. (ECF No. 76-1, PAGEID #: 598.) As support for the proposition that it could not have been only Black inmates who were moved, Defendant Schifer attaches MCI's Offender Bed Management policy, which provides that "[g]enerally, no more than

four (4) beds . . . in a row should be of the same race and racial balance in cell blocks and dormitories shall represent the daily institutional racial balance as a whole or within ten percent." (ECF No. 76-1, PAGEID #: 603.) Thus, MCI's Offender Bed Management policy does not mandate—it says "should," not "shall"—racial balancing and, even if it did, the effective date of this policy is listed as November 29, 2024, almost three years after the alleged violations, and there is nothing in the record indicating this policy was in place or followed during the relevant time period. (*Id.* at PAGEID #: 602.) In other words, the policy does not rebut Plaintiff's argument when it comes to the issue of summary judgment.

Defendants also argue that Plaintiff's First Declaration and the attached National Action Network ("NAN") letter describing issues with the MCI Institution Inspector's investigation into inmate's complaints of discriminatory treatment, including Plaintiff's bed move in December 2021, fail to establish wrongdoing by Defendants Laytart and Schifer.[2] (ECF No. 83, PAGEID #: 667.) Even if true, Plaintiff's Second Declaration and Mr. Robert's Declaration still directly contradict Defendants' version of the relevant events and call into question Defendants Laytart's and Schifer's involvement with the bed move.

Finally, as with Plaintiff's retaliation claim, Defendants' assertion that Central Office and other officials alone controlled the bed moves is supported only by their own declarations and does not negate the genuine factual dispute over their involvement and motivation.

Viewing these competing accounts in the light most favorable to Plaintiff, a reasonable jury could find that he was treated less favorably than similarly situated white inmates with respect

[2] Defendants assert that the "only mention" of Plaintiff in the National Action Network letter is a reference to a complaint Plaintiff filed in 2018. (ECF No. 83, PAGEID #: 668.) To the contrary, the NAN letter states that, contrary to Defendants' version of events, "the video footage from the veterans dorm . . . clearly show[s] Kelley . . . being removed from the last bunk in (D-Row), the bed being turned sideways (never removed nor relocated), re-occupied by a caucasian inmate, and Kelley relocated to a bed in the middle of (C-Row)." (ECF No. 81, PAGEID #: 625–26.)

to bed assignments. Summary judgment on Plaintiff's equal protection claim is therefore unwarranted.

Accordingly, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **DENIED** as to Plaintiff's Fourteenth Amendment equal protection claim.

## IV. CONCLUSION

For the reasons above, it is **RECOMMENDED** that Defendants' Motion to Strike (ECF No. 84) and Motion for Summary Judgment (ECF No. 76) be **DENIED**.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**

*/s/ S. Courter M. Shimeall*
**S. COURTER M. SHIMEALL**
**UNITED STATES MAGISTRATE JUDGE**